[Crim. No. 33440. Second Dist., Div. Five. July 23, 1979.]

THE PEOPLE, Plaintiff and Appellant, v.
SOLOMON PINSKY, Defendant and Respondent.

## COUNSEL

John K. Van de Kamp, District Attorney, Harry B. Sondheim and Dirk L. Hudson, Deputy District Attorneys, for Plaintiff and Appellant.

George V. Denny III for Defendant and Respondent.

## OPINION

**ASHBY, J.**—In a nonjury trial defendant Solomon Pinsky was found guilty on 9 out of 10 charged counts of grand theft. (Pen. Code, § 487, subd. 1.) Thereafter defendant discharged his attorney and hired a new attorney who moved for a new trial on the ground that defendant received constitutionally ineffective assistance of counsel at his trial. The court granted the motion for new trial on this basis, and the People appeal. (Pen. Code, § 1238, subd. (a)(3).) We conclude there was no showing trial counsel was incompetent and therefore we reverse.

From 1974 to 1976 defendant obtained merchandise on credit from the nine victims and did not pay the debts totaling over $53,000.[1] He represented himself as Sol's Auto Distributors, 826 Dodsworth in Covina. He obtained such merchandise as calculators, cameras, and radios purportedly as promotional items for his customers.

Several victims unsuccessfully tried to locate defendant at 826 Dodsworth. The landlord who rented commercial space to defendant at that address (a warehouse operation) testified he had never seen defendant there, had never observed more than little bits of scattered merchandise at the location, and that the business was not open on a daily basis.

---

[1]Electronic Emporium, $4,505; Hoffman Consumer Product, $6,138; Nat Halpern Company, $11,260; American Typewriter Store, $3,897; All Makes Dictating Machine Company, $2,074; Olympic Camera Shop, $4,998; Bev Mar Corporation, $4,317; Claremont Camera Store, $4,346; Woody Winkler Company, $1,677.

Although defendant assured some victims he would pay them, he told one, Robert Triester, "You are not going to get any. I have dealt with the biggest and the best and I haven't been caught yet."

To show criminal intent the prosecution also proved 10 similar noncharged transactions dating from 1968 to 1976 in which defendant obtained merchandise on credit accumulating debts of over $100,000.

Defendant's retained trial attorney, Mr. Weinstein, brought out in cross-examination from various witnesses that defendant had made some payments, including payments after credit was no longer being extended, and that except as to Mr. Treister defendant did not say that he would not pay. He elicited from the commercial landlord that defendant had always paid his rent on time and had been a good tenant for 14 years. Six witnesses testified for the defense. Two rabbis testified that defendant's reputation in the community for honesty, integrity, and veracity was good. William Pollard testified he had done business with defendant over 15 years. He did $3,000 to $5,000 worth of business per month with defendant and was always paid. He had never heard anything against defendant in the automotive business community and would do business with defendant today. David Mas testified he had known defendant for 20 years and was associated with him in the tire business in 1960 and 1961. Mas' welding business is in the neighborhood of defendant's business, and defendant's reputation among other persons in that neighborhood was that of a truthful and honest person. Although Mas had not had any business dealings with defendant since 1964, he would be willing to lend him money today. Joseph Servais testified he had known defendant for 15 years and had sold him automobiles and automobile parts on credit. At various times defendant owed thousands of dollars, but he paid in a period of a few months. Servais knew 20 to 25 people in the automobile business who also knew defendant, and his reputation for truth, honesty, and veracity with those people is good. Servais would be willing to lend money to defendant today. Paul Smith testified he had sold auto parts to defendant for nine years. Defendant had always paid and was always honest with him and other people that Smith knew. Smith would lend money to defendant today.

Mr. Weinstein argued strenuously to the court that the prosecution had not proved the requisite fraudulent criminal intent. He argued defendant was merely a bad businessman who owed money to many suppliers. He contended it had not been shown the circumstantial evidence was more consistent with guilty intent than innocent intent. He pointed out that

defendant had made some payments and that defendant had not given a false name or address. He contrasted defendant with the thousands of people who go bankrupt every year and are not charged with grand theft. He brought out discrepancies in the evidence as to count VIII which resulted in defendant's acquittal on that count. The court nevertheless found defendant guilty on nine counts.

Defendant discharged Mr. Weinstein as his attorney and hired a new attorney, Mr. Denny, to represent him on a motion for new trial. The motion was based on the contention that Mr. Weinstein gave defendant constitutionally ineffective assistance of counsel at trial. Declarations by defendant and by three psychiatrists, one of whom had been consulted by Mr. Weinstein, were submitted in support of the motion. At the call of the prosecution, Mr. Weinstein testified at the hearing on the motion. The trial court "reluctantly" concluded that defendant had received constitutionally inadequate assistance of counsel at trial based on two grounds: (1) Mr. Weinstein gave no satisfactory explanation of the decision not to present, or at least further explore, a psychiatric defense; and (2) Mr. Weinstein gave "no coherent explanation" of the decision that defendant should not take the stand at trial. We conclude the record does not support either conclusion.

With regard to the first issue, the declaration of Dr. Michael B. Coburn, who examined defendant at Mr. Weinstein's request prior to trial and who consulted with Mr. Weinstein, stated:

"3. In the course of my evaluation of Mr. Pinsky, it became quite clear that he was an individual who was significantly depressed, with a poor sense of self, and a growing lifetime pattern of actually blotting out pieces of reality which would come and go and tend to interfere with his image of himself. This unconscious process culminated in the development of his self-deluding behavior which had been identified in the present case and is responsible for his arrest.

"4. While not being actively psychotic, nevertheless he had been able to exercise an abnormal amount of the unconscious psychological mechanism of denial, to the extent that he was able to consciously experience his condition as being without material conflict and as being one which could be thought to improve itself in the future. This must be understood as not merely a conscious rationalization, justification, or evasion of the truth, but an unconscious expression of an intolerable conflict arising from the difference between what he *was* and what he

needed to see himself *as*. The snowballing effect of his activities only served to push conscious awareness and feeling regarding the acts deeper into the interior of his psyche, until the exposure through the Criminal Justice System caused his defenses to crumble, and forced him to the present situation and to the depression which required treatment.

"5. His behavior should be understood as being materially and qualitatively different from a more purely 'anti-social' or pecuniary-motivated set of actions, and to be significantly neurotic and representative of his basic depression and self-esteem problems, rather than representative of an anti-social or criminal outlook or character structure." (Italics in original.)[2]

Mr. Weinstein testified at the hearing that he had experience in two homicide cases with the defense of diminished capacity and he referred defendant to Dr. Coburn to see whether such a defense could be used in this case. Two or three times he discussed the matter at length with Dr. Coburn. Prior to trial, Weinstein came to the conclusion that "I didn't feel that it [the defense of diminished capacity] would lie. [¶] Q. [by the prosecution] Okay. [¶] For what reasons? [¶] A. Based on what Dr. Coburn told me. [¶] Q. Okay."

The motion for new trial also contained the declaration of Dr. William J. Sullivan.[3] Dr. Sullivan declared after a three-hour interview with defendant that in his opinion defendant "was fully oriented in all spheres, alert, responsive, and in good contact with his surroundings. He was slightly depressed, but not dangerously so. . . . There was no evidence of any psychotic processes in him, no delusions or hallucinations. His affect was appropriate. . . . His thought process was normal."

In Dr. Sullivan's opinion, "Mr. Pinsky is a somewhat passive man, who has had the hope and dream of becoming a very successful business entrepreneur, a sort of 'wheeler-dealer.' He has wanted to grow rapidly in his business, and to enlarge and diversify his lines. He also is quite naive in business and has a poor grasp of basic business fundamentals. His concept of credit and its use is fuzzy, and he hoped through the use of credit to grow rapidly. He became, psychologically speaking, like a

---

[2]Apparently Dr. Coburn's oral discussions with Mr. Weinstein prior to trial were to the same effect.

[3]The motion for new trial suggested this was a ground for a new trial on the basis of newly discovered evidence. The court found the evidence was not newly discovered in that it could have been secured prior to trial with reasonable diligence.

'junkie' hooked on credit, and needed more and more credit as time went on to cling to his dream of a big, flourishing business. He found an ample supply of 'pushers' who were eager to give him all the credit he wanted. He was able to deny the reality of his sinking further and further into debt, to the extent that he could not realistically expect ever to pay it all off. He clung to the idea that it would all work out, and that he only needed more time. Mr. Pinsky refused to look at the reality of the situation, but used denial and repression to continue on with his hope. There was a passivity and unreality to his reactions in dealing with the problems of his excessive debt." In Dr. Sullivan's opinion, defendant "did not plan or intend to take the merchandise without paying for it, but his poor business sense and his ambition to be a big success, in the context of his passive character, led him along the path of least resistance into an unrealistic pattern of buying on credit. His numerous business errors and poor practices insured the gradual failure of his business. Rather than face this fact, he dreamed of straightening out the affairs of his business and paying off his creditors. He would not accept the impossibility of this, but hung on, sinking deeper into a morass of debt."

In granting the motion for new trial the court believed that Mr. Weinstein's explanation (that he felt a diminished capacity defense would not lie based upon what Dr. Coburn told him) was wholly conclusionary and that therefore the record did not establish any valid reason for not presenting a psychiatric defense. We disagree.

■ The burden of proving a claim of constitutionally ineffective assistance of trial counsel is on the defendant. The defendant must show that trial counsel failed to act in a manner to be expected of a reasonably competent attorney acting as a diligent advocate. In addition, the defendant must establish that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense. Where the record shows that counsel's omissions resulted from an informed tactical choice within the range of reasonable competence, the claim of ineffective assistance of counsel is not established. (*People* v. *Pope,* 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859].) Whether the attorney's conduct falls within the range of a reasonably competent attorney is in this case a question of law for this court to decide. (*People* v. *Pope, supra,* at p. 426.)

■ In this case the record establishes that counsel investigated a psychiatric defense by consulting Dr. Coburn, concluded that a defense of diminished capacity did not lie, and decided to present a defense based upon character witnesses and defendant's good reputation in the business

community rather than a psychiatric defense. We conclude the record does not establish incompetence of counsel.

First, counsel correctly concluded that the opinion of Dr. Coburn did not show "diminished capacity" in the sense that such doctrine requires evidence of a *mental disease or defect* which rendered the defendant *incapable of entertaining* the specific intent to defraud. (See *People* v. *Gentry*, 257 Cal.App.2d 607, 611 [65 Cal.Rptr. 235]; see also *People* v. *Berry*, 18 Cal.3d 509, 517 [134 Cal.Rptr. 415, 556 P.2d 777]; *People* v. *Terry*, 2 Cal.3d 362, 400 [85 Cal.Rptr. 409, 466 P.2d 961].) Dr. Coburn's opinion contained no such conclusion. The opinion of Dr. Sullivan added no substantial evidence of diminished capacity in this sense.

Although not establishing "diminished capacity," the psychiatric evidence was arguably relevant to negate that at the time he purchased the merchandise defendant had a fraudulent mental intent not to pay for it. (See *People* v. *Marsh*, 58 Cal.2d 732, 736-737 [26 Cal.Rptr. 300, 376 P.2d 300]; *People* v. *Ashley*, 42 Cal.2d 246, 264 [267 P.2d 271].) Dr. Sullivan's opinion added nothing significant to Dr. Coburn's opinion on this point, either. Both psychiatrists were of the opinion that defendant was not psychotic. Both were of the opinion that defendant simply wanted to see himself as a big businessman and that his emotional need for a positive self-image led him to choose to repress in his mind the unpleasant reality of his situation. The psychiatric evidence only established that defendant has a somewhat greater capacity than the average normal person for self-delusion and repressing into the subconscious the unpleasant facts in his environment. (See *People* v. *Gentry, supra,* 257 Cal.App.2d 607, 610-612.)

It was well within the range of conduct of a reasonable attorney acting as a diligent advocate to decide to forego such type of psychiatric defense in favor of the good character and reputation defense which was presented. We think the character and reputation defense used at trial presented a far more appealing characterization of the defendant than the one given by the psychiatrists. The trial evidence painted defendant as an honest businessman. The psychiatric evidence painted him as an unsympathetic character who chose to ignore the unpleasant facts because he wanted to see himself as a big "wheeler-dealer." In our opinion, counsel acted reasonably in choosing a more sympathetic defense posture. The potential psychiatric defense would have detracted from the sympathetic and appealing characterization of defendant Mr. Weinstein attempted to prove at trial. Thus the record shows that counsel had two potential

defenses which were basically inconsistent, and he chose to present the one which could reasonably appear to the average competent attorney to be the more attractive. In these circumstances, defendant has not borne the burden of proving that counsel "failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates." (*People* v. *Pope, supra,* 23 Cal.3d 412, 425.) *Pope* focuses attention on the objective standard of what a reasonably competent attorney would do; the mere fact that counsel at the hearing did not articulate this choice in detail should not be controlling. Where the appellate court can tell from the record that the choice of which of two defenses to present was reasonable under the *Pope* standard, "the record" does not establish incompetence of counsel.

The second ground for the trial court's conclusion of ineffective assistance of counsel was the absence of a coherent explanation of the decision not to place defendant on the stand at trial. The record does not support this conclusion. Mr. Weinstein testified at the hearing that he discussed with defendant whether defendant should take the stand and that there was a mutual decision, recommended by Weinstein, that defendant should not. Weinstein's reasons were, "One, he [defendant] was very emotionally upset at the time and two, based on things that he and I discussed." Defendant's own declaration states that prior to trial he was suicidal and, even after overcoming suicidal feelings he was a "physical, mental and emotional wreck." Before trial he discussed with Mr. Weinstein going on the witness stand and "[a]t that point I was such a wreck that it was clear to both of us that emotionally there was no way I could handle it, so I did not testify." This is overwhelming evidence that counsel properly recommended that defendant not take the stand.

Defendant argues that the court could nevertheless find incompetence of counsel on the grounds that the pretrial conduct by Mr. Weinstein *caused* defendant to become the emotional wreck which precluded his taking the stand. Defendant made the following allegations in his declaration: On Weinstein's recommendation defendant saw Dr. Coburn twice. Dr. Coburn then stated that further visits were unnecessary unless defendant felt the need. Six months later defendant "felt the need to go back to the doctor. Because of the way the case was being handled, and because every visit with Mr. Weinstein seemed like part of a nightmare, I began to feel suicidal. I couldn't see Dr. Coburn, so I was seen by Dr. Bernard M. Kirzner." Defendant explained to Mr. Weinstein his previous trouble with loan sharks, the defective merchandise given by some of the complainants in this case, their unreasonable warranty and price policies,

defendant's refusal to file for bankruptcy because he felt a moral obligation to pay, and his denial of making the incriminating statement to Robert Treister which was introduced at trial. "After every visit with Mr. Weinstein, I felt rotten. I could not talk to him. He made me feel completely worthless." Weinstein would vary from friendly to domineering. Weinstein told defendant that he thought defendant was guilty. When defendant would try to explain to him how he got into his predicament, Weinstein did not want to hear it. Weinstein got very angry when defendant and his wife suggested he get cocounsel.

Dr. Bernard Kirzner declared that defendant consulted him in January 1978 for "severe depressive symptomatology secondary to the court proceedings. . . ." Defendant then had suicidal ideation, numerous physical complaints associated with his depression, and was racked with anxiety and indecision. Defendant "felt that nobody was listening to him or understood his position, even at times, his attorney."

We find no substantial evidence in this record that conduct by defense counsel caused defendant's emotional condition. Preparation for this trial was undoubtedly stressful and defendant's inability to bear the strain is understandable, particularly in light of the psychiatric opinions as to his character weaknesses which caused him to get into this trouble in the first place. But there is no evidence this condition was caused by the conduct of defendant's attorney. We find no support in the record for the second claim of ineffective assistance of counsel.

The order granting a new trial is reversed.

Stephens, Acting P. J., and Hastings, J., concurred.

A petition for a rehearing was denied August 21, 1979, and respondent's petition for a hearing by the Supreme Court was denied September 26, 1979.